**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CENTIMARK CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. _____ |
| v. | ) | |
| | ) | |
| CHRISTOPHER BAUER and | ) | *Electronically Filed* |
| DDP ROOFING SERVICES, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>VERIFIED COMPLAINT</u>

Plaintiff CentiMark Corporation ("CentiMark"), by and through its undersigned counsel, Buchanan Ingersoll & Rooney PC, files this action against former employee Christopher Bauer ("Bauer") and his new employer, a direct competitor of CentiMark in the competitive roofing industry, DDP Roofing Services, Inc. ("DDP") to stop Bauer and DDP from using CentiMark's customer relationships developed through Bauer for CentiMark for DDP's benefits, their violating or interfering with Bauer's post-employment obligations to CentiMark by having Bauer work in an overlapping sales territory that CentiMark paid Bauer to develop tens of millions of dollars in sales, customer relationships, and confidential information over the past ten years for CentiMark.

This Verified Complaint results from DDP's continual bad acts of hiring more than 15 employees from CentiMark over the past two years, including multiple employees with employment agreements that prohibit certain of those former CentiMark employees from soliciting other CentiMark employees, soliciting CentiMark customers with whom they had developed relationships for CentiMark, and competing against CentiMark in the same territories to which they were assigned. While DDP is well aware of CentiMark's agreements with its

former employees, DDP continues to employ CentiMark's employees in positions that result in their violating their statutory, common law and contractual obligations to CentiMark. As a result, immediate injunctive relief is necessary to prevent such unfair competition.

## I.   INTRODUCTION

1.     This is an action by CentiMark to secure damages and equitable relief against Defendants for their collective efforts to steal CentiMark trade secrets, loot CentiMark's competitively sensitive information therein, unfairly undercut CentiMark bids, raid CentiMark's employees, and poach CentiMark clients.

2.     Bauer was a long-term employee of CentiMark, with no previous roofing experience, and over his twenty-three (23) years with CentiMark, he moved up the ranks to a Senior Project Manager position in the Mid-East Region based out of the Jessup, Maryland Branch Office, where he acted as the "face" of CentiMark in Southern Delaware and Eastern Maryland.

3.     In this Mid-East Region for 2015 and 2016, Bauer was responsible for over **$5 million in sales** and in producing those sales results, Bauer accessed, utilized, and developed CentiMark's most confidential and valuable sales information and customer relationships in this Region.

4.     Bauer received annual compensation in 2015 of over $155,000 and in 2016 of over $130,000, which he controlled in terms of his sales, and Bauer participated in the CentiMark Employee Stock Ownership Plan, which provided him with over $255,000 in terms of his ownership interest.

5.     After multiple other sales employees resigned to work for DDP, a direct competitor of CentiMark, Bauer also quit and began working for DDP in what appears to be an

overlapping territory, soliciting the same customers for which he worked servicing and selling to on behalf of CentiMark.

6.      DDP and Bauer knew about, presumably discussed, and then chose to ignore Bauer's obligations to CentiMark, including using its trade secrets and customer relationships for their personal advantage.

7.      CentiMark must stop DDP and Bauer from seeking to gain its customers and projects using CentiMark's Confidential Information and relationships; Defendants should be enjoined from Bauer using any of his relationships with CentiMark's customers and CentiMark's valuable trade secrets, directly or indirectly, for DDP's benefit and CentiMark's detriment.

## II.      PARTIES

8.      CentiMark is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

9.      DDP Roofing Services, Inc. is a Pennsylvania corporation with its principal place of business in Glen Mills, Pennsylvania, and it advertises that it does business in 28 states, including Pennsylvania.

10.      On information and belief, Bauer is an individual Pennsylvania citizen residing in Landenberg, Pennsylvania and working as an Account Manager for DDP.

## III.      JURISDICTION

11.      This Court has jurisdiction over this civil action under 28 U.S.C. § 1331 because the matter in controversy involves claims arising under the federal Defend Trade Secrets Act, 18 U.S. C. § 1831 *et seq*.

12.      This Court has personal jurisdiction over Bauer because he has the required minimum contacts with this forum to establish personal jurisdiction.

13.     Bauer was employed by CentiMark, which is headquartered in the Western District of Pennsylvania, and CentiMark has at all relevant times conducted business from its Washington County offices, causing Bauer to have substantial and direct contacts with its headquarters for 23 years, including:

(a)     Entering into employment, receiving promotions from, and entering into his employment agreement with CentiMark once such an agreement was warranted, including corresponding with its Legal Department, which is based in Canonsburg, Pennsylvania;

(b)     Regularly contacting, via telephone, email or other means, as well as receiving support from the multiple departments, including, but not limited to, the Human Resources Department, the Insurance Department, the Legal Department, the Accounting Department, the Benefits Department, the Corporate Safety Representative, all of which are located in Canonsburg, Pennsylvania;

(c)     Receiving all compensation, commissions, benefits, expense reimbursements from Canonsburg, Pennsylvania;

(d)     Receiving technological systems for his sales efforts in the form of databases, servers, system administration, email, and technology personnel from Canonsburg, Pennsylvania;

(e)     Receiving and accessing policies, manuals, templates, marketing materials, pricing information, customer information, and other important sales information from Canonsburg, Pennsylvania.

14.     All of these essential functions that allowed Bauer to earn a living were channeled through the Western District of Pennsylvania, and a substantial part of the injury that will and continues to irreparably impact CentiMark is in the Western District of Pennsylvania.

15.     Additionally, this Court had personal jurisdiction over DDP because it has the required minimum contacts with this forum because it has registered to do business in Pennsylvania, solicits roofing work throughout Pennsylvania, and performs work in the Western District of Pennsylvania.

16.     Furthermore, the Employment Agreement at issue is governed by and interpreted in accordance with the laws of Pennsylvania.

17.     Venue is proper in the United States District Court for the Western District of Pennsylvania under 28 U.S.C. § 1391(2) because the events giving rise to CentiMark's claims against Bauer and DDP arise out of events in and impacting Canonsburg, Pennsylvania, with the key witnesses and documents for CentiMark located in the Western District of Pennsylvania.

**IV.     FACTUAL BACKGROUND**

**A.     CentiMark operates in a highly-competitive industry where success depends on customer relationships.**

18.     CentiMark, founded in 1968 in Pittsburgh, has grown to become one of the largest commercial roofing contractors in North America.

19.     CentiMark markets, sells, installs and services roofing and flooring systems to primarily commercial and industrial customers throughout the United States and Canada.

20.     CentiMark operates out of approximately 80 offices.

21.     The roofing industry is a highly-competitive marketplace with many companies offering similar services vying for the same projects.

22.     Because of the size and importance of many of these projects, price alone – while an important factor – is not the only variable that factors into contractor selection.

23.     Thus, CentiMark focuses on providing high-quality products and services and developing strong customer relationships, including obtaining details about its customers and their preferences that are stored in customer relationship management databases, such as SalesForce, that are password protected.

24.     Like its competitors, CentiMark's sales efforts are primarily carried out by a dedicated sales force comprised of individual salespeople assigned to specific territories or accounts.

25.     CentiMark's salespeople, like others in the industry, develop sales in a variety of ways, but most importantly through relationship building with customers that reside in their territories or are assigned to them as accounts.

26.     These relationships, built over time, can often become the most important factor in roofing contractor selection, as customers come to rely upon the salesperson as their point of contact and the "face" of CentiMark.

27.     CentiMark's salespeople inspect roofs, coordinate service calls for repairs, provide quotes and estimates for roofing or repair jobs, serve as the liaison to the customer for all roofing needs, and assist in the management of roofing projects that are underway.

28.     As such, CentiMark places a great deal of trust in its salespeople by entrusting them with a vital company asset – the relationship between CentiMark and its customers.

29.     CentiMark also entrusts its sales people with its confidential, proprietary business information, including:  technical information, such as methods, research and development projects, processes, formulas, compositions, data, computer programs, hardware, software and inventions; business information, such as development or marketing plans or strategies, competitive intelligence, supplier information, promotional programs, financial or legal information, sales information, correspondence, proposals, account and pricing information, customer information, including customer names, purchasing and payment histories, client contacts, and potential or prospective customer information; personnel information; information

disclosed to CentiMark by others in confidence; and other valuable, non-public information ("Confidential Information").

30.      CentiMark invests a great deal of money in the salaries, commissions and draws of its salespeople in order to build strong customer relationships between CentiMark and its customers.

31.      CentiMark further supports its salespeople and their efforts to build strong customer relationships on behalf of the company by providing an inside telemarketing force; a dedicated service department that provides effective service, responsive operations staff, high quality roofing products and roofing systems that are consistently improved and updated; administrative support; a dedicated technical/estimation support staff to assist in preparing proposals; customer directories and/or reimbursement of expenses incurred in creating a customer database; computer hardware, software, and support services for use in preparing proposals and maintaining customer relationships; reimbursement of business-related expenses; and the strength and recognition of the CentiMark name.

**B.      CentiMark taught Bauer the roofing business over 23 years.**

32.      CentiMark hired Bauer as a roofing laborer at a rate of $8.00/hour in 1994.

33.      Bauer did not have roofing experience or existing relationships with roofing customers at the time he joined CentiMark.

34.      Bauer learned the roofing industry through the training, support, and on-the-job experience provided at CentiMark.

35.      CentiMark recognized Bauer with four promotions between 1994 and 2003.

36.      During the same period, Bauer's compensation more than doubled, and CentiMark afforded Bauer a $650/month vehicle allowance.

37.     In July 2003, CentiMark promoted Bauer to Associate Project Manager and, in conjunction with the promotion, Bauer's compensation was increased from $19.50/hour to a salary of $50,000 plus 1% commission on gross sales.

38.     CentiMark provides its employees with substantial benefits, including stock in its Employee Stock Ownership Plan and Trust, which provided over $255,000 to Bauer.

39.     As an Associate Project Manager, Bauer's primary responsibility was to sell roofs, roofing systems, and repairs/service in his assigned territory, which included specific counties in Delaware (Kent, New Castle and Sussex) and Maryland (Baltimore, Caroline, Carroll, Cecil, Dorchester, Frederick, Harford, Howard, Kent, Queen Annes, Somerset, Talbot, Wicomico and Worcester).

40.     CentiMark promoted Bauer to Senior Project Manager in 2005, which is a high-level sales position at CentiMark.

41.     CentiMark invested in Bauer so that Bauer, in turn, could invest in CentiMark's customers.

42.     By way of example, CentiMark funded and paid Bauer thousands of dollars per year in reimbursement for travel, business entertainment, and gifts.

43.     In addition to compensation, ownership interest, expense reimbursement, vehicle allowance, health benefits, computer, and cell phone, CentiMark gave Bauer training, opportunities (such as at trade shows and high-level contacts with national sales accounts customers), experience, as well as some of its most valuable and confidential resources: (a) customer history database (the password-protected SalesForce), (b) SAP, (c) AutoProposal, (d) AutoQuote, (e) numerous warranty lists through which he could develop sales leads,

(f) historic and current proposal information, (g) national sales account support and information, (h) bidding and specification programs, and (i) the password-protected CentraNet Sales Portal.

44.     CentiMark also gave Bauer access to the contact persons at the customers with the power to make decisions, enter into contracts, and make purchases so that he could develop and grow those relationships for CentiMark.

45.     Specifically, CentiMark supported Bauer by providing him with an inside sales force, dedicated service department, responsive operations team, estimating team, high-quality products that are consistently improved and updated, administrative support, reimbursement of business expenses, and recognition of the CentiMark name.

46.     The customer goodwill and confidential sales information CentiMark paid Bauer to develop is among its most valuable assets, which it protects through its employment agreements with its higher-level employees.

**C.     Bauer entered into the Agreement containing confidentiality, non-competition and non-solicitation obligations to protect CentiMark.**

47.     In exchange for, and as a condition of, his July 2003 promotion to Associate Project Manager, Bauer agreed to certain post-employment obligations.

48.     Without Bauer agreeing to those post-employment obligations, Bauer would not have received the promotion or attendant increase in compensation with commission.

49.     The terms of Bauer's employment as an Associate Project Manager were set forth in an Employment and Non-competition Agreement ("Agreement").  A copy of the Agreement is attached hereto as **Exhibit A**.

50.     The Agreement is governed by Pennsylvania law.  Exhibit A at § 4.3.

51.     By executing the Agreement, Bauer agreed to be bound by certain post-employment obligations, including a non-disclosure of confidential information provision, a non-

competition provision, and non-solicitation of employees, customers or suppliers provisions. *Id.* at §§ 2.1, 2.4, 3.1-3.3.

52.     Bauer specifically acknowledged that he would have access to CentiMark's materials, documents, records and Confidential Information, "including, without limitation, any business records which [Bauer] may create or assemble, policy or procedure statements, correspondence, memoranda, plans, proposals, computer hardware, software or data, customer lists, marketing and sales documents, financial or legal documents or records, reports, drawings, formulations, blueprints, notebooks, designs, samples, prototypes, proposals, inventory, and equipment." *Id.* § 2.1; *see also id.* at § 2.2.

53.     Bauer agreed to use such Confidential Information "only as required by his . . . duties to the Company or by law" and not to disclose such Confidential Information to any third person absent CentiMark's written consent. *Id.* at § 2.4.

54.     Bauer further agreed that:

> [F]or 12 months following the termination of [Bauer]'s employment, he . . . shall not, directly or indirectly, **accept employment** with or perform, **represent, solicit, sell, render services** for, or obtain any ownership interest in (except for incidental purchases of registered securities for investment purposes) **any commercial/industrial roofing/flooring contractor** in direct competition with the Company within a **Restricted Area or Market** which in whole or in part sells or attempt to sell any products or services which are the same as, or similar to any products or services sold by the Company.

*Id.* at § 3.2 (emphasis added).

55.     The Agreement defines "Restricted Area or Market" to mean "the geographic District(s) in which [Bauer] was employed or assigned by the Company during any portion of the three year period preceding [his] termination of employment." *Id.*

56.     Bauer further agreed that:

> [F]or 12 months following the termination of [Bauer]'s employment, he . . . shall not, directly or indirectly, **solicit the trade of, or trade with, any customer, prospective customer, or supplier of the Company for roofing/flooring products and services** with whom Employee had contact during his . . . employment with the Company.

*Id*. at § 3.3 (emphasis added).

57.     "Prospective customer" includes "any customer, person or other business entity, contacted by Company during [Bauer]'s employment with Company." *Id*.

58.     With respect to CentiMark's employees, Bauer agreed:

> [F]or 12 months after [Bauer]'s termination from employment, [Bauer] will **not directly or indirectly solicit or induce or attempt to solicit or induce any other employee of the Company to leave his or her employment** with the Company; **or hire or recruit or attempt to hire or recruit any employee of the Company** for any employment in a line of business competitive with that conducted by the Company.

*Id*. at § 3.1 (emphasis added).

59.     Bauer acknowledged that CentiMark "has a legitimate business interest in preventing [him] from engaging in activities Competitive with the Company" and that his "experience and capabilities are such that he. . . can obtain employment in business without breaching the terms and conditions" of the Agreement. *Id*. at § 3.4.

60.     Bauer further acknowledged that a breach of the Agreement would cause CentiMark irreparable harm. *Id*. at § 4.1.

   **D.     CentiMark trusted Bauer with its most valuable assets – its Confidential Information and personal customer relationships.**

61.     Over the course of more than a decade, Bauer became the "face" of CentiMark for many customers in the Delaware and Maryland markets.

62.     Bauer became the person that these customers associated with CentiMark and trusted to help them with regard to CentiMark's products and services.

63.     With CentiMark's training, resources, and Confidential Information, Bauer was successful in selling to customers in the Mid-East Region with sales frequently over $3 million per year and was well compensated for those sales efforts.

64.     Additionally, in his role as a CentiMark Senior Project Manager, Bauer was exposed to and charged with developing CentiMark's Confidential Information.

65.     For example, Bauer was exposed to CentiMark's product information not publicly available, profit margins, pricing, unique problems or difficulties faced with customers and/or projects that could be exploited by a competitor, customer contact information, sales lists, and sales volumes of customers.

66.     In fact, Bauer generated, with the full help and support of CentiMark, numerous spreadsheets and proposals containing confidential and proprietary business information, including but not limited to, warranty information, customer contact information, and pricing information.

67.     For example, Bauer regularly contacted the Marketing Manager to gather information on customers who Bauer believed to be potential leads, and the Marketing Manager compiled information, including previous jobs that CentiMark had worked on for the customers and the proposals that CentiMark had provided to the customers.

68.     Bauer would then use that information to understand customers' trends, proclivities, and how best to approach the customer.

69.     Bauer was also able to access directly CentiMark's databases of valuable Confidential Information, such as the detailed information in SalesForce and in CentraNet Sales Portal, both of which are password protected so that only those high-level employees with a need to access such information are able to do so.

70.     Bauer also worked with CentiMark's technical representatives who would inspect CentiMark's customers' properties and provide Bauer with information about the customers to develop proposals on behalf of CentiMark.

71.     Bauer was exposed to Confidential Information about its customers, their projects as they are inspected, specified, quoted, installed, repaired and/or serviced.  In addition to developing the customer relationships themselves, Bauer also gained valuable insight into CentiMark's customers' roofing needs, projections and timing of future projects, unique specifications, negotiating strategies, points of contact, budgets, and decision makers.

72.     Bauer was also exposed to CentiMark Confidential Information, including product information not publicly available, including but not limited to, warranty lists, profit margins, pricing, unique problems or difficulties faced with customers, and/or projects that could be exploited by a competitor, customer contact information, sales lists, sales volumes of customers, etc.

73.     CentiMark's customer relationships and Confidential Information – which are initiated, created, cultivated, nurtured and solidified at great expense to CentiMark – are legitimate business interests worthy of protection.

74.     Accordingly, CentiMark vigilantly safeguards its Confidential Information and takes steps to protect itself from employees and competitors who might otherwise seek to capitalize on the misappropriation of information such as key financial terms, customer buying patterns, the identities of customer contacts, customer sales prices, customer operations, customer needs and preferences, discounts historically offered to customers, upcoming customer projects and budgets and other information associated with the goodwill of the sales relationship.

75.     One of the ways CentiMark seeks to protect its legitimate business interests is through post-employment restrictions such as those set forth in Bauer's Agreement.

76.     Additionally, CentiMark restricts the information that it distributes so that even high-level employees only receive information relevant to their positions and roles and only after entering into appropriate agreements.

77.     Besides receiving CentiMark's protected Confidential Information, to perform his functions as a Senior Project Manager, Bauer also developed new customer relationships and continued to build on customer relationships on CentiMark's behalf.

78.     Many of the customers in his territory became important repeat customers of CentiMark, generating hundreds of thousands of dollars of revenue on an annual basis, which enabled Bauer to develop long-standing relationships with these important customers.

79.     The relationships that CentiMark's salespeople (like Bauer) initiate, create, cultivate, nurture, and solidify at great expense to CentiMark are a legitimate business interest worthy of protection through post-employment restrictions upon its employees.

80.     Such relationships necessarily expose salespeople like Bauer to the Confidential Information of CentiMark and its customers as projects are inspected, specified, quoted, installed, repaired and/or serviced.

81.     In addition to developing the customer relationships themselves, Bauer also gained valuable insight into CentiMark's customers' roofing needs, projections and timing of future projects, unique specifications, negotiating strategies, points of contact and decision makers.

82.     By way of example, for two consecutive years, CentiMark provided Bauer with information in December 2015 and December 2016 related to marketing strategy, territory

saturations, development of under-performing territories, National Accounts, and open paper proposals. Such Confidential Information is the very type of valuable, confidential strategic business information that Bauer could not help but use as an Account Manager for DDP against CentiMark.

83.     These customer relationships and CentiMark's Confidential Information -- if not entitled to protection -- have (and will continue to) be exploited.

84.     Specifically, DDP will gain an unfair competitive advantage over CentiMark by simply acquiring CentiMark's valuable business assets without incurring the costs and expenses necessary to establish such relationships or information themselves through years of trial and effort and Bauer will not be able to help but use and disclose such information in his new position at DDP.

**E.     DDP is well aware of CentiMark's Confidential Information, restrictive covenants and investment in its employees.**

85.     DDP is a growing roofing business that markets to customers in 28 states in the East United States and is headquartered in Pennsylvania. These states overlap with where CentiMark markets to the same commercial roofing customers.

86.     DDP consistently has been recruiting and hiring CentiMark's employees in a targeted manner and using its CentiMark's former employees' relationships and knowledge to hire away its valuable employees in which CentiMark invests extensively, including providing Confidential Information appropriate for the certain employees' positions.

87.     After DDP hired Mike Mangiaruga ("Mangiaruga"), CentiMark's former Vice President of National and Regional Sales and DDP's current Executive Vice President of Sales and Marketing, DDP acknowledged its and Mangiaruga's obligations to abide by the terms of Mangiaruga's employment agreement with CentiMark. *See* Letter from Paul J. Becker, the

President and CEO of DDP, sent to Timothy M. Dunlap, CentiMark's President and CCO, dated

August 18, 2015 letter, attached as **Exhibit B** ("August 18, 2015 Letter").

88.     In the August 18, 2015 Letter, DDP conceded the enforceability of CentiMark's

post-employment entitlements, acknowledging that CentiMark "has gone to great lengths and

great expense marketing, developing, training and maintaining their current client base and

employees." Exhibit B.

89.     Despite DDP's promises not to harm CentiMark, in the second quarter of 2017,

CentiMark became aware from its employees and customers that Mangiaruga was targeting

CentiMark's customers and employees.

90.     Mangiaruga developed, accessed, and continues to know CentiMark's

Confidential Information by virtue of his 20 plus years with CentiMark.

91.     In fact, Mangiaruga even markets himself in his "DDP bio" by noting his more

than "20+ years with CentiMark."

92.     CentiMark alerted DDP and Mangiaruga about its concerns that they were not

fairly competing with CentiMark and were using its Confidential Information acquired through

Mangiaruga to target relationships about which Mangiaruga had intimate knowledge because of

his employment with CentiMark.

93.     For example, CentiMark received DDP's Preventive Maintenance Agreement that

appears very similar to the form that CentiMark has been using.

94.     A CentiMark customer notified CentiMark that shortly after it had discussions

with CentiMark about a potential job, the customer received a call from DDP asking about the

roofing job – the customer joked that it was as if CentiMark notified DDP of the opportunity.

95.     Around that same time, CentiMark also learned from a current employee that a recruiter called, stating that Mangiaruga wanted to speak with him and when he spoke with him, Mangiaruga promised that he could "work around his non-compete restriction" implying that DDP did not need to abide by it.

96.     Furthermore, DDP, including through Mangiaruga sending LinkedIn messages and speaking with CentiMark's employees, solicited and hired at least 15 employees of CentiMark over the past two years.  These 15 DDP hires from CentiMark include, but not limited to, foreman and entire crews, constituting employee raiding.

97.     Among these many hires, several of them are sales and service professionals with existing, enforceable restrictive covenants and knowledge of CentiMark's Confidential Information.

98.     These former CentiMark professionals include:  (a) Bauer, who resigned in June 2017, (b) Ben Kimak, Service Director, who resigned in August 2017, (c) Brian Bannigan, a sales professional, who resigned in June 2016, and (d) Ryan Tincknell, Technical Representative, who resigned in January 2016.

99.     Recently, CentiMark has received additional information from CentiMark employees related to Bauer's LinkedIn activity since he changed employment to DDP and his and DDP's solicitation of customers of which Bauer had information.

100.     DDP, with Bauer, is slowly expanding its business on the Confidential Information, customer relationships, and employee relationships that CentiMark has worked to develop and create – such unfair competition must be stopped.

**F.**     **Bauer is now soliciting CentiMark's customers on behalf of CentiMark's competitor, DDP.**

101.     Bauer resigned his employment with CentiMark in June 2017, providing only one week notice after 23 years of employment.

102.     At the time of separation, Bauer requested a copy of the Agreement and represented to CentiMark that he did not yet have a new employer.

103.     CentiMark provided Bauer a copy of the Agreement as requested.

104.     Despite his obligations to CentiMark, Bauer now works as an Account Manager for CentiMark's direct competitor, DDP.

105.     Specifically, DDP offers roofing inspection, repair, maintenance, and replacement products and services to commercial customers.

106.     On information and belief, Bauer's employment with DDP requires him to violate his non-competition, non-solicitation, and non-disclosure obligations to CentiMark because he is now responsible for servicing, managing and growing DDP's commercial roofing business in the same or an overlapping territory that he was paid by CentiMark to develop, including by calling upon the Confidential Information that he developed and acquired during his employment with CentiMark.

107.     On or about June 29, 2017 – when another CentiMark representative arrived to conduct a roof inspection for its existing customer, Amports, for a project located on Fairfield Road in Baltimore, Maryland – the representative observed Bauer inspecting the roof on behalf of DDP.  The contact who CentiMark had for this job was a person who Bauer had the responsibility for developing a relationship with on behalf of CentiMark.

108.     By way of letters dated June 30, 2017, CentiMark notified Bauer and DDP that such conduct violates Bauer's Agreement with CentiMark.  *See* Letters from A. Shapren to C.

Bauer and G. Lentz dated June 30, 2017, which are attached hereto as **Exhibits C and D**, respectively.

109.    CentiMark relied upon Bauer's promises not to disclose CentiMark's Confidential Information, compete with CentiMark, or solicit CentiMark's customers in order for CentiMark to have time, among other things, (a) for a new CentiMark representative to develop relationships with the customers previously assigned to Bauer; and (b) for the Confidential Information to grow stale, such that Bauer and DDP would not have the unfair competitive advantage of using CentiMark's goodwill and Confidential Information against it.

   **G.    Bauer and DDP are unlawfully raiding CentiMark's workforce.**

110.    Bauer and DDP have unlawfully solicited, induced, recruited and encouraged CentiMark's employees to leave employment at CentiMark, including, but not limited to, the above-identified employees.

111.    In late June 2017, CentiMark learned from its current employees that both Bauer and DDP are attempting to contact them via LinkedIn, despite Bauer's obligations not to engage in any direct or indirect solicitations.

112.    Likewise, while DDP is free to compete fairly for employees, it should not be using CentiMark's former employees, including ones like Bauer who have non-solicitation obligations, to be reaching out to CentiMark employees or gaining information about CentiMark's employees.

   **H.    CentiMark is entitled to injunctive relief.**

113.    CentiMark is likely to succeed on the merits of this case because:  (a) CentiMark entered into a valid, enforceable Agreement with Bauer in order to protect its legitimate business interests and Bauer's breach of the Agreement is open, blatant and obvious; (b) Bauer cannot perform his role for DDP without calling upon the CentiMark's Confidential Information;

(c) CentiMark is party to valid, enforceable contracts with its customers and employees, of which Bauer is personally aware and with which Bauer is nevertheless interfering; and (d) DDP is aware of, but nevertheless interfering with, Bauer's Agreement and similar contracts between CentiMark and its other employees, which DDP should be prevented from raiding.

114.    CentiMark's customer relationships, goodwill, market share, business opportunities, competitive advantage, employee relationships and the security of its Confidential Information will be immediately and irreparably harmed if injunctive relief is not granted.

115.    CentiMark's contractual relationship with Amports and, on information and belief, its contractual relationships with other customers in the Delaware and Maryland markets, will be immediately and irreparably harmed if injunctive relief is not granted.

116.    CentiMark will suffer far greater harm if injunctive relief is not granted than Bauer or DDP will suffer if it is granted.

117.    Indeed, Bauer will suffer no harm but will simply be ordered to honor the promises he made to CentiMark.

118.    DDP will suffer no harm but will simply be required to lawfully compete with CentiMark in the commercial roofing marketplace.

119.    Unless and until Bauer and DDP are enjoined from their wrongful and unlawful conduct, CentiMark has been and will continue to be irreparably harmed by the unlawful conduct. Such harm includes, without limitation:  (a) having to compete against the significant investment it made in Bauer, which it contracted to protect; (b) having to compete against Bauer, who is armed with CentiMark's Confidential Information; (c) the loss of opportunities to provide products and services to current and prospective customers; (d) the loss of goodwill; (e) diminution in the value of its Confidential Information due to actual and threatened

misappropriation; and (f) the impact Bauer's unhindered departure and competition will have on other CentiMark employees with similar restrictive covenants.

120.     Granting injunctive relief will serve the public interest.

**COUNT I**
**Breach of Contract**
**(CentiMark v. Bauer)**

121.     CentiMark incorporates by reference Paragraphs 1 through 120 of the Verified Complaint as if the same were set forth in full herein.

122.     The Agreement is a valid, enforceable contract supported by adequate consideration and was voluntarily and knowingly entered into by Bauer.

123.     The restrictions contained in Bauer's Agreement are reasonably limited to protect CentiMark's legitimate business interests.

124.     Customer relationships, goodwill and Confidential Information constitute legitimate business interests.

125.     Such legitimate business interests are protected under Pennsylvania law, which applies under the Agreement.

126.     By the conduct described above, Bauer breached (and continues to breach) the Agreement.

127.     Bauer's knowing, willful and intentional breach of the Agreement has caused – and will continue to cause – immediate and irreparable harm to CentiMark, as well as causing it to suffer other compensatory damages.

## COUNT II
## <u>Tortious Interference with Contractual Relations</u>
### (CentiMark v. Bauer and DDP)

128.    CentiMark incorporates by reference Paragraphs 1 through 127 of the Verified Complaint as if the same were set forth in full herein.

129.    CentiMark is party to a valid and enforceable Agreement with Bauer.

130.    Under the terms of the Agreement, Bauer is prohibited from disclosing CentiMark's Confidential Information, competing with CentiMark, or soliciting CentiMark's customers or employees post-termination.

131.    DDP has been aware of Bauer's post-employment obligations to CentiMark since before DDP hired Bauer – CentiMark has been communicating about its former employee's restrictive covenants since 2016.

132.    DDP intentionally interfered with CentiMark's Agreement with Bauer by employing him to perform work on its behalf for the same customers in the same or overlapping territory during the restrictive covenant period and capitalizing on Bauer's misappropriation of CentiMark's Confidential Information.

133.    On information and belief, DDP has encouraged Bauer to further breach his Agreement, either directly or indirectly through other DDP personnel, including by soliciting CentiMark's employees to leave employment with CentiMark.  (CentiMark is aware of other former CentiMark employees now employed by DDP who also have post-employment obligations that they may not be honoring).

134.    On information and belief, Bauer has or will seek to interfere with other contractual arrangements between CentiMark and its customers that were established and grown by Bauer for CentiMark's benefit.

135.    There is no privilege or justification for DDP's conduct.

136.    There is no privilege or justification for Bauer's conduct.

137.    DDP's conduct is knowing, willful, intentional, malicious, unprivileged, in bad faith, and has caused – and will continue to cause – immediate and irreparable harm to CentiMark, as well as causing it to suffer other compensatory damages.

138.    Bauer's conduct is knowing, willful, intentional, malicious, unprivileged, in bad faith, and has caused – and will continue to cause – immediate and irreparable harm to CentiMark, as well as causing it to suffer other compensatory damages.

### COUNT III
### Violation of the Defend Trade Secrets Act
### (CentiMark v. Bauer)

139.    CentiMark incorporates by reference Paragraphs 1 through 138 of the Verified Complaint as if the same were set forth in full herein.

140.    CentiMark owns valuable Confidential Information, including trade secrets.

141.    In the course of his employment, CentiMark afforded Bauer access to and use of its Confidential Information, which includes protectable trade secrets.

142.    The Confidential Information, including trade secrets, to which Bauer had access is related to CentiMark's products or services that are used in or intended for use in interstate or foreign commerce.

143.    CentiMark has spent significant time and money developing such Confidential Information, including trade secrets.

144.    CentiMark's Confidential Information, including trade secrets, is protected, kept confidential, and not publicly disclosed.

145.     CentiMark's Confidential Information is valuable and would be harmful to CentiMark in the hands of its competitors.

146.     Disclosure and unauthorized use of this type of information undermines CentiMark's competitive position in the highly-competitive commercial roofing industry.

147.     On information and belief, Bauer is still in possession of, or has used, disclosed, or relied upon CentiMark's Confidential Information, including trade secrets, in order to benefit himself or DDP and to compete against CentiMark.

148.     Bauer's conduct is knowing, willful, intentional, malicious, unprivileged, in bad faith, and caused – and will continue to cause – immediate and irreparable harm to CentiMark, as well as causing it to suffer compensatory damages.

149.     Pursuant to Section 1836 of the Defend Trade Secrets Act, CentiMark is entitled to injunctive relief, compensatory damages, exemplary damages, an award of reasonable attorneys' fees and/or other appropriate relief.

### COUNT IV
### Violation of the PUTSA
### (CentiMark v. Bauer)

150.     CentiMark incorporates by reference Paragraphs 1 through 149 of the Verified Complaint as if the same were set forth in full herein.

151.     Bauer is a "person" as defined by the Pennsylvania Uniform Trade Secrets Act ("PUTSA") codified at 12 Pa. Cons. Stat. Ann. § 5301 *et seq.*

152.     In the course of his employment, CentiMark afforded Bauer access to and use of its Confidential Information, which includes protectable trade secrets.

153.     CentiMark has spent significant time and money developing such Confidential Information, including trade secrets.

154.     CentiMark's Confidential Information, including trade secrets, are protected, kept confidential, and are not publicly disclosed.

155.     CentiMark's Confidential Information is valuable and would be harmful to CentiMark in the hands of its competitors.

156.     By virtue of his employment and Agreement with CentiMark, Bauer was obligated to maintain the confidentiality of CentiMark's Confidential Information, including trade secrets, as well as not to use them for his personal benefit or that of DDP.

157.     On information and belief, Bauer is still in possession of, or has used, disclosed, or relied upon CentiMark's Confidential Information, including trade secrets, in order to benefit himself or DDP.

158.     Furthermore, Bauer will inevitably disclose and continue to disclose and use CentiMark's Confidential Information, including trade secrets, to compete directly with CentiMark on behalf of DDP.

159.     Disclosure and unauthorized use of this type of information undermines CentiMark's competitive position in the highly-competitive commercial roofing industry.

160.     As a direct and proximate result of the misappropriation of CentiMark's Confidential Information, including trade secrets, CentiMark has suffered and will continue to suffer substantial damages, including but not limited to the loss of goodwill and profits.

161.     Bauer's conduct is knowing, willful, intentional, malicious, unprivileged, in bad faith, and has caused – and will continue to cause – immediate and irreparable harm to CentiMark, as well as causing it to suffer other compensatory damages.

162.     Pursuant to Sections 5303-5305 of the PUTSA, CentiMark is entitled to injunctive relief, double damages and affirmative relief to ensure protection of its trade secrets, an award of reasonable attorneys' fees, exemplary damages and/or other appropriate relief.

**COUNT V**
**Unfair Competition**
**(CentiMark v. Bauer and DDP)**

163.     CentiMark incorporates by reference Paragraphs 1 through 162 of the Verified Complaint as if the same were set forth in full herein.

164.     Bauer, by engaging in the conduct described above, has engaged in unfair competition with CentiMark.  Bauer's breach of the Agreement and misappropriation of CentiMark's Confidential Information, including trade secrets, has caused (and will continue to cause) damage to CentiMark's goodwill, customer relationships, prospective customer relationships, contractual relationships, employee relationships and valuable business interests.

165.     DDP, by engaging in the conduct described above, has engaged in unfair competition with CentiMark.  DDP's interference with CentiMark's contractual relationships has caused (and will continue to cause) damage to CentiMark's goodwill, customer relationships, prospective customer relationships, contractual relationships, employee relationships and valuable business interests.

166.     Bauer's conduct has been (and continues to be) willful, intentional, and unprivileged and has caused (and will continue to cause) CentiMark to suffer immediate, irreparable harm, as well as other compensatory damages.

167.     DDP's conduct has been (and continues to be) willful, intentional, and unprivileged and has caused (and will continue to cause) CentiMark to suffer immediate, irreparable harm, as well as other compensatory damages.

168.    Bauer's conduct, as described above, is contrary to honest industrial and commercial practices.

169.    DDP's conduct, as described above, is contrary to honest industrial and commercial practices.

## PRAYER FOR RELIEF

WHEREFORE, CentiMark respectfully requests this Court enter an order:

1.    Enjoining (a) Bauer from violating his Employment and Noncompetition Agreement in any manner, (b) DDP from interfering with Bauer's Employment and Noncompetition Agreement in any manner, (c) Bauer and DDP from any unfair competition, (d) Bauer and DDP from any tortious interference with any of CentiMark's customer relations, prospective customer relations, and employee relationships.

2.    Awarding CentiMark compensatory damages, including pre- and post-judgment interest.

3.    Awarding CentiMark its expenses and attorneys' fees for this litigation as required by the Defend Trade Secrets Act and PUTSA.

4.    Awarding any other relief as the Court may deem to be just or appropriate.

Dated:  August 31, 2017              Respectfully submitted,

BUCHANAN INGERSOLL & ROONEY PC

By: *s/ Jaime S. Tuite*
Jaime S. Tuite, Esquire  *(PA #87566)*
jaime.tuite@bipc.com
Tiffany A. Jenca, Esquire  *(PA #319526*)
tiffany.jenca@bipc.com
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219-1410
Phone:     (412) 562-8419
Facsimile:  (412) 562-1041
*Attorneys for Plaintiff*

## <u>VERIFICATION</u>

I, Mark A. Cooper, with a title of Executive Vice President, am authorized to execute this verification on behalf of CentiMark Corporation.  I have read the foregoing Verified Complaint and I believe it to be true and correct to the best of my knowledge, information and belief.

This Verification is made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn declarations under penalty of perjury.

Dated: August 31, 2017

Mark A. Cooper